· **James WHITFIELD, Plaintiff,**

**v.**

**Kenneth APFEL, Commissioner of Social Security, Defendant.**

**No. 98–CV–2748 (ADS).**

United States District Court,
E.D. New York.

March 13, 2000.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The plaintiff, James Whitfield ("Whitfield"), commenced this action pursuant to the Social Security Act, 42 U.S.C. § 405(g) (the "Act"), seeking review of a final administrative determination of the Commissioner of the Social Security Administration (the "Commissioner"), denying his application for Social Security Disability Insurance Benefits. Whitfield challenges the Commissioner's finding that he was not "disabled" within the meaning of the Act. Whitfield alleges that he has been disabled since May 15, 1988. However, his eligibility for insurance under the Act expired on September 30, 1994. At issue are the cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## BACKGROUND

### A. Procedural History

On September 12, 1995, Whitfield filed an application for Social Security Disability Insurance benefits. His application was denied, both initially on November 8, 1995, and on reconsideration on February 21, 1996. Whitfield's request for an administrative hearing was granted. The hearing was held on December 17, 1996 before an Administrative Law Judge (the "ALJ"). The ALJ found that he was not entitled to disability insurance because his injuries did not rise to the level of a disability within the meaning of the Act. On February 9, 1998, the Appeals Council denied Whitfield's request for review. Whitfield commenced this action on April 10, 1998, seeking a review of the Commissioner's decision.

### (i) The Plaintiff's Testimony at the Hearing

Whitfield was born on August 19, 1950 and is now 49 years of age. He has completed a little more than one year of col-

Binder & Binder, Jericho, NY, by Charles E. Binder, of counsel, for plaintiff.

Loretta Lynch, United States Attorney, Eastern Dist. of New York, Brooklyn, NY, by Richard Webber, Assistant United States Attorney, for defendant.

lege. Whitfield was employed as a New York City police officer from 1968 until 1988. During that period, Whitfield suffered several on-the-job injuries, including being thrown through a plate glass window and a car accident. He took disability retirement on May 15, 1998 due to problems with his right knee.

According to Whitfield, in 1982, he was thrown through a plate glass window by an assailant and spent several weeks in traction. Since then, he suffered sciatic nerve discomfort and numbness in his left leg, extending up into his pelvis. In addition, in 1984, Whitfield was involved in a motor vehicle accident while on duty, which resulted in his knees being slammed into the dashboard of the car. He claims to suffer numbness and pain in his knee which prevents him from sitting for more than an hour. In 1987, Whitfield underwent surgery on his knee to repair a torn meniscus. Following the surgery, he returned to work but continued to experience problems and took disability retirement a few months later. In addition, Whitfield cited a tumor in his nose that caused him difficulty in breathing and he also made vague reference to some shoulder pain.

Whitfield contends that he is only able to sit for about an hour, after which the pain and numbness in his knee requires him to stand up for about five minutes. After five to ten minutes of standing and flexing his knee, circulation improves and he can return to sitting for another half an hour, although he alleges that his back pain remains constant throughout. He is able to lift 10–15 lbs., and is able to climb one to two flights of stairs before his knee begins to buckle. He is able to walk his dog for a few blocks and can drive a car, although if required to drive long distances, he must stop periodically to flex his knee.

#### (ii) The Medical Evidence

##### (a) Dr. Thompson

Whitfield apparently began being treated by Dr. Thompson, an orthopedic sur-

geon, on May 7, 1987. At that time, Whitfield reported that he had been having increasing pain and weakness in his right knee for the preceding six months. Dr. Thompson's consultation notes from this initial visit are not complete in the record. He returned to Dr. Thompson on May 28, 1987, at which time he reported patellofemoral discomfort and joint line pain. Dr. Thompson sought approval for arthroscopic surgery, and continued a regimen of limited duty and activity modification for Whitfield. On August 3, 1997, Whitfield complained of back pain in the lumbo-sacral junction. Dr. Thomson diagnosed this condition as chronic intermittent activity related low back strain. He recommended physiotherapy. At a visit on August 24, 1987, Dr. Thompson noted Whitfield as "able to work" with intermittent, activity-related pain.

On September 22, 1987, Whitfield underwent arthroscopic surgery on his right knee. In treatment notes dated two days later, Dr. Thompson reported that he was stable and his knee looked good. He was authorized to undergo 6 weeks of physiotherapy. At a follow-up visit on October 1, 1987, Dr. Thompson reported that Whitfield had moderate range of motion in his knee, but was not satisfied that he had only attended one physiotherapy session. At the end of October 1987, Dr. Thompson again saw Whitfield and observed that he had full range of motion and no reports of pain or weakness in his knee, but directed that his physiotherapy continue. On December 10, 1987, Dr. Thompson found that Whitfield was improving and showing greater strength, but that "there is still a deficit."

On February 18, 1988, Dr. Thompson's notes indicate that Whitfield "has been retired as he states." At that visit, Dr. Thompson noted that Whitfield's functional level had improved and that his activity level was markedly improved. In two visits with Dr. Thompson in March, 1988, Whitfield's condition was "unchanged," and

by the end of March, his activity level had continued to increase and he reported feeling more stable on his knee. Dr. Thompson next saw Whitfield on May 25, 1988, at which time his condition remained unchanged, and in a visit on June 2, 1988, Dr. Thompson reported that his knee "tends to be stable."

The record contains no treatment notes from Dr. Thompson from June 1988 until February 1, 1990, at which time Whitfield reported that "he still gets some activity related pain in his knee especially when getting up from a low position or when twisting." More than two years passed before Whitfield was again seen by Dr. Thompson. On March 12, 1992, Dr. Thompson noted that Whitfield has significant crepitus of both knees with grading and irregularity of his articular surfaces and pain on resisted extension. Dr. Thompson diagnosed the problem as degenerative joint disease of the knees and prescribed activity modification with a low range of motion. Dr. Thompson's notes end with "he should be still be (sic) considered as disabled." Another three years passed, and in an office visit on May 18, 1995, Dr. Thompson recounted Whitfield's history, observing that his injury resulted in him "having to be chronically disabled by 1988." At the time of the 1995 visit, Whitfield was "still" showing significant weakness in his lower extremities and activity intolerance that was consisted with continued disability.

In a May 1, 1997 letter to Whitfield's attorney, Dr. Thompson recounted the treatment notes discussed above, although he refers to two visits by Whitfield, one on February 1, 1989 and one on February 16, 1989, that are not memorialized by treatment notes in the record. Dr. Thompson concludes that Whitfield "should be considered as suffering a permanent partial disability referable to his knees," and that his right and left knees should be rated at 26% and 17% respectively. Dr. Thompson did not make any specific findings or comments about Witfield's ability to perform any kind of work.

### (b) *Dr. Dutta*

On October 13, 1995, Whitfield was examined at the request of the Social Security Administration by Dr. Dutta, a general surgeon. Dr. Dutta observed that Whitfield's "right knee is stiff an painful," and that his muscle power and tone were normal. Dr. Dutta concluded that Whitfield has osteoarthritis of the right knee, and stated that Whitfield can do some light physical work, including sitting 2–3 hours, standing for 2 hours, walking for up to a mile, and carrying 25–35 lbs. on an occasional basis.

### (c) *Dr. Pearl*

On December 13, 1996, Whitfield was examined, apparently at the request of his attorneys, by Dr. Pearl, an orthopedic surgeon. Dr. Pearl's examination found a wasting of the vastus medialis muscle and an abbreviated range of motion limited by pain and crepitation. X-rays reveals patellofemoral osteoarthritis and advanced degenerative changes of the lateral joint line. Dr. Pearl felt that the 1987 arthroscopic surgery neither caused nor prevented the osteoarthritic changes in Whitfield's knee. It was Dr. Pearl's impression that Whitfield is completely disabled with regard to doing any physical activity and that he should not do any work that requires any walking.

### (d) *The Disability Determination and Transmittal*

A Disability Determination and Transmittal, dated February 15, 1996 and prepared by the Department of Health and Human Services of the Social Security Administration, stated that the Whitfield was not disabled through September 30, 1994. It was determined that Whitfield could frequently lift 10 pounds, and occasionally lift up to 20 pounds; that he could stand or sit for up to 6 hours in an 8 hour workday;

and had unlimited capacity to push and pull objects.

## B. The ALJ's Findings

The ALJ determined that from May 15, 1988 until his insurance eligibility lapsed on September 30, 1994, Whitfield "was severely impaired by internal derangement of the right knee," but that he retained the residual functional capacity to perform at least sedentary work. Thus, the ALJ concluded that his impairment did not direct a finding that he was disabled under Table 1 of Appendix 2, Subpart P, part 404 of the Regulations.

The ALJ also found that Whitfield suffered from an impairment in the form of a sinus inverting papiloma in 1994 that caused frequent nosebleeds and difficulty breathing, but that these problems caused no more than a slight limitation on his ability to perform work related activities. The ALJ found no impairment of Whitfield's shoulder or back, as he sought no treatment for the shoulder problems during his period of insurability, and that he complained of back problems only once to Dr. Thompson in 1987, and never sought further treatment.

In rejecting the opinion of Dr. Thompson, the treating physician, that Whitfield was chronically disabled since 1988, the ALJ found that Dr. Thompson's opinion was not supported by the objective medical evidence. Particularly, the ALJ noted that Dr. Thompson's reports show that as of 1987, Whitfield reported no pain or buckling of his knee, and that several subsequent visits showed Whitfield's stability and strength improving. Further, the ALJ found that from June 1988 to May 1995, a period of seven years during which Whitfield claims to have been disabled because of a knee impairment, he sought treatment from Dr. Thompson on only two occasions, which suggests that Whitfield's limitations and symptomology were not as severe as he claimed.

## DISCUSSION

### A. Standard of Review

■ This Court reviews challenges to the Commissioner's decisions to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g) (1994); *Brown v. Apfel*, 174 F.3d 59, 61–62 (2d Cir.1999) (citing *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir.1991)). Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Brown*, 174 F.3d at 62–63, *citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* at 62, *quoting Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam). "In reviewing an ALJ's decision, we consider the entire administrative record, including new evidence submitted to the Appeals Council following the ALJ's decision." *Id., citing Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). The Court's responsibility "is always to ensure that a claim has been fairly evaluated." *Id., quoting Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir.1983).

### B. Availability of Benefits

Federal disability insurance benefits are available to those individuals who are "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). To be eligible for disability benefits under the Act, Whitfield must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has promulgated a five-step analysis for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. As the Second Circuit recently explained:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the Regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual function capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform ... [T]he claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir.1998), *quoting Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982); *see also Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir.1998); *Schaal*, 134 F.3d at 501. To meet its burden of proof on the fifth step, the Commissioner may rely on the medical vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the grids." The grids

take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the grids indicate whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the grids is dispositive on the issue of disability. However, the grids are not dispositive where they do not accurately represent a claimant's limitations that significantly diminish her capacity to work.

*Rodriguez v. Apfel*, 1998 WL 150981 (S.D.N.Y.1998) (citations omitted). There are five levels of exertion which are derived from the grids: sedentary, light, medium, heavy, and very heavy. These criteria are used to determine what level of exertion a claimant is capable of performing in an occupational setting.

Here, the ALJ preformed the above analysis. With respect to the first step, the ALJ found that the Whitfield was not employed. At the second step, he found that Whitfield's injuries constituted a severe impairment which limited his ability to perform some work-related activities.

At the third step of inquiry, the ALJ was required to determine whether the impairment was among the list of impairments determined by the Social Security administration to be so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d). If the injuries do not fall under a specified listing, then the claimant can still establish eligibility by "equaling" a listed disability with the impairment or a combination thereof. 20 C.F.R. § 404.1520(d). Here, the ALJ concluded that the plaintiff was "severely impaired" by internal derangement of the right knee. However, he concluded that Whitfield did not have an impairment or combination of impairments which would equal in severity those included in the listings.

Accordingly, the ALJ proceeded to determine the fourth step: whether the plaintiff retained the residual functional capacity to perform his past work. The ALJ found that Whitfield was previously employed as a police officer and his impairments prevented him from returning to that form of work.

However, at the fifth step, the ALJ consulted the sedentary work grid, finding that during the period of insurance, Whitfield was a younger individual, a high school graduate, and had non-transferrable skilled work experience. Under this set of factors, the grids yield a finding that Whitfield was not disabled.

### C. The Treating Physician Rule

Whitfield's first argument on appeal is that the ALJ committed legal error by failing to properly assign controlling weight to the opinion of his treating doctor in accordance with 20 C.F.R. § 404.1527(d)(2). As discussed above, Dr. Thompson treated Whitfield from May 1987 until May 1995, and stated variously that Whitfield was "disabled," "chronically disabled," and "partial[ly] disab[led]." Notably, Dr. Thompson never explicitly stated whether or not he considered Whitfield capable of performing sedentary work.

There is no dispute that the law accords special evidentiary weight to the opinion of the treating physician. Specifically, the regulations state that:

> Generally, we give more weight to opinions by your treating sources. . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.127(d)(2), 416.927(d)(2).

■ "The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999) (citing 20 C.F.R. § 404.1527[d][2] ) (additional citations omitted); *see also Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998) (same); *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993) (same). In analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa v. Callahan,* 168 F.3d at 79, *citing McBrayer v. Secretary of Health and Human Servs.,* 712 F.2d 795, 799 (2d Cir.1983).

The Second Circuit has stated the factors to be considered when the treating physician's opinion should be given controlling weight:

> (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist. In addition, the regulations provide that the agency "will always give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source opinion."

*Clark,* 143 F.3d at 118, *citing* 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2); *see also Schaal,* 134 F.3d at 503–04 (citing same).

■ At the outset, Whitfield is hampered by the fact that Dr. Thompson's "opinion" as to his functional capacity is unclear. Whitfield's argument that Dr. Thompson considers him "disabled" is largely derived from a comment in passing on a 1992 treatment note that he should "still be considered as disabled," a cryptic statement which offers no context or clarification, particularly since Dr. Thompson had never previously stated that he considered Whitfield disabled. Moreover, it is not clear whether that 1992 comment is made in reference to Whitfield's inability to perform his strenuous former duties as a police officer or in reference to Whitfield's inability to perform *any* productive

work. This is in stark contrast to a 1997 report in which Dr. Thompson characterizes Whitfield as having only a *"partial* disability." (Emphasis added). This 1997 report was prepared by Dr. Thompson specifically for use in Whitfield's claim for disability benefits. As a result, it should be considered as more accurately reflecting the doctor's considered opinion of Whitfield's disability status under the Act than a non-specific, passing comment in his treatment notes. Thus, even if Whitfield is correct that the ALJ erred by not giving Dr. Thompson's opinion controlling weight, the most clear expression of opinion by Dr. Thompson as to Whitfield's condition establishes that Whitfield is not totally disabled, and giving controlling weight to that opinion would compel a finding that Whitfield is not eligible for benefits.

Nevertheless, in the Court's view, the ALJ did not err in giving controlling weight to the opinion of Dr. Thompson, as his opinion that Whitfield was disabled was not consistent with the medical evidence available in the case. Of the four *Clark* factors, only the fourth—whether the opinion is from a specialist—weighs clearly in favor Whitfield.

On the first *Clark* factor—the frequency of examination and length of treatment—the ALJ observed that Dr. Thompson frequently examined Whitfield in 1987 and early 1988, during which time he stated in his reports that Whitfield's knee looked good; he had full range of motion; there were no reports of pain or weakness in his knee; and that his knee "tends to be stable." However, he conducted only four examinations over the more than six year period from May 15, 1988 to September 30, 1994 when Whitfield was eligible for benefits. In three of those four examinations, reference again was made directly or indirectly to Whitfield's knee feeling "stable." The record does not reflect that Dr. Thompson ordered any new X-rays or MRI scans of Whitfield, despite the fact that often, periods of several years elapsed between visits.

As to the second factor in *Clark* —the evidence supporting the opinion—there is little in the record to support Dr. Thompson's opinion that Whitfield is totally disabled. Even assuming that the one comment in a 1992 treatment note can be considered Dr. Thompson's "opinion" on Whitfield's ability to perform any gainful activity, the record does not reflect that Dr. Thompson ever specifically evaluated Whitfield's ability to perform sedentary work. The examination notes from 1990 indicate that Whitfield suffered pain "when getting up from a low position or when twisting," but never stated that Whitfield's knee prevented him from sitting. Moreover, even in 1995, when Dr. Thompson made the observation that Whitfield should be "considered disabled," Whitfield was complaining of pain only "on getting up from low positions, squatting and stair climbing." Nothing in Dr. Thompson's records ever indicate that Whitfield ever reported an inability to sit for any extended period of time, an important component of sedentary work.

The third *Clark* factor—the consistency of the opinion with the record as a whole—also weighs against Whitfield. As discussed above, the record as a whole reflects Dr. Thompson considered Whitfield to be only partially disabled. Moreover, the only two functional analyses of Whitfield's abilities in the record, one by Dr. Dutta and one by the doctor making the initial disability determination, both established that Whitfield could sit or stand for periods of up to six hours, and thus, he could easily perform part-time gainful activity under 20 C.F.R. § 404.1572(a). Dr. Thompson never made any specific assessment of Whitfield's functional abilities, and Dr. Pearl's report merely states that Whitfield is incapable of performing "physical activity," but says nothing of his ability to perform non-physical sedentary work.

Therefore, the Court finds that the ALJ did not err in declining to give controlling

weight to the opinion of Dr. Thompson, as the substantial medical evidence in the record fails to support his conclusion. Even if the ALJ did err by not giving controlling weight to Dr. Thompson's opinion, the Court finds that Dr. Thompson's most relevant opinion on the issue of Whitfield's disability under the Act is the opinion contained in his 1997 report that Whitfield is partially, not totally, disabled. In that case, Whitfield would nevertheless not be eligible for benefits.

### D. Credibility of Whitfield

■ Whitfield's final argument in support of his appeal is that the ALJ erred in discrediting Whitfield's own testimony. However, except as to the testimony concerning the extent of his symptoms, the ALJ made no particular finding that Whitfield was not credible. The ALJ's finding that Whitfield's minimal contact with his own physician during the insured period evidenced less severe functional restrictions than he testified to is supported by the record. Dr. Thompson's treatment notes, read in the light most favorable to Whitfield, unquestionably demonstrate that Whitfield was experiencing improvement in his recovery following the surgery up until 1988. If, in fact, Whitfield began experiencing the severely limiting pain and weakness he testified to at the hearing, such pain must have begun developing in late 1988 as Dr. Thompson's notes establish that in 1987 and early 1988, Whitfield's knee was stable, had a full range of motion, and was free of pain. Coincidentally, Whitfield's visits to Dr. Thompson all but ceased beginning in late 1988. The ALJ did not err in finding Whitfield's subjective testimony about his limitations to be exaggerated in light of the objective evidence that he failed to actively consult Dr. Thompson to seek relief from those limitations after a positive course of treatment in 1987 and 1988. Moreover, Whitfield's own testimony on this point—that he saw Dr. Thompson "every six months" during his period of insurability is demonstrably false. The record clearly establishes that the hiatus between visits during the insured period was measurable in years, not months.

Whitfield's credibility was further undermined by remarks he apparently made to Dr. Dutta that he spends his time "taking care of his parents, reading the newspaper, watching TV, reading books and computers." This contention contradicts, to some extent Whitfield's contention that he cannot sit for any reasonable period of time.

In any event, even if the ALJ erred in discounting Whitfield's testimony regarding the extent of his limitations, the record still reflects that Whitfield is capable of performing sedentary work. Whitfield testified that he could sit for up to an hour, then stand for five minutes to restore circulation in his knee, and then return to sitting for another half-hour. Nothing in Whitfield's testimony suggested that this pattern of sitting and standing could not be maintained for a significant period of time. Whitfield clearly appeared to testify that it was his back pain that prevented him from sitting for too long. For example, he testified that, after standing for a few minutes, he could return to sitting "about another half and (sic) hour or so without too much of a problem in the knee, but like I said, the back, it stays a problem." However, the ALJ found that Whitfield had no medically determinable back impairment, a finding that Whitfield does not challenge on appeal.

Thus, even if the ALJ had fully credited Whitfield's testimony as to the extent of his knee impairment, the record reflects that Whitfield was able to alternate periods of sitting for a half-hour and standing for five minutes "without too much of a problem." Under these circumstances, while Whitfield would certainly be disabled from police work or physical labor, he could continue to perform sedentary work. The regulations define sedentary work as "involv[ing] lifting no more than 10 pounds, ... involv[ing] sitting, ... [and]

walking and standing are required occasionally." 20 C.F.R. § 404.1567(a). Whitfield essentially admitted that he can meet the physical requirements of sedentary work, and therefore, the ALJ did not err in finding that Whitfield was not disabled under the Act.

Therefore, the Court finds that substantial evidence in the record supports the ALJ's decision not to credit Whitfield's testimony as to the extent of his function limitations.

## CONCLUSION

Having reviewed the parties' submissions, and for the reasons set forth above, Whitfield's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is DENIED, and the Defendant's cross-motion for judgment on the pleadings is GRANTED. The Clerk of the Court is directed to close this case.

**SO ORDERED.**