Wanda ALBANO, Plaintiff,

v.

Carolyn W. COLVIN, Acting
Commissioner of Social
Security, Defendant.

No. 14–CV–3650 (WFK).

United States District Court,
E.D. New York.

Signed April 16, 2015.

Harold Skovronsky, Brooklyn, NY, for Plaintiff.

Social Security Administration—Generic, Karen T. Callahan United States Attorneys Office Brooklyn, NY, for Defendant.

### DECISION AND ORDER

WILLIAM F. KUNTZ, II, District Judge:

This is a review of a denial of Disability Insurance Benefits ("DIB") by Carolyn W. Colvin, the Acting Commissioner of Social Security ("Commissioner"). Plaintiff Wanda Albano ("Plaintiff") commenced this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's final decision denying her application for DIB. Before the Court are motions for judgment on the pleadings from each party. For the reasons set forth below, the Commissioner's motion is GRANTED and Plaintiff's cross-motion is DENIED.

### FACTUAL AND PROCEDURAL HISTORY

Plaintiff is a fifty-nine year-old female United States citizen who was born on April 8, 1956. Dkt. 13 ("R.") at 31, 123. She is 5′ 8″ tall and weighed approximately 238 pounds in early 2012. *Id.* at 26, 148, 279. Plaintiff is married, and reports that she lives with a roommate. *Id.* at 30. She has a general equivalency diploma. *Id.* at 31. From 1996 until June 2010, Plaintiff worked in an office doing "filing[,]" "administrative things like an office," speaking to customers on the phone and answering phones, and running errands that involved going to the bank, going to the post office, and dropping off packages with "papers and things." *Id.* at 33–35; *see also id.* at 149 (identifying work as "Clerical"). Plaintiff stopped working on June 10, 2010 as a result of a knee injury. *Id.* at 148.

Plaintiff suffered an injury to her right knee in June 2010. *Id.* at 26. She had knee surgery in 2010, but reports that she continues to experience shooting pains as a result of her injury. *Id.* at 28, 31. Plaintiff reported that she has received shots and pain killers, including Vicodin, Cymbalta, and Meloxicam, for her pain. *Id.* at

36–37. The shots provide relief for a few days. *Id.* at 36. Plaintiff has also been prescribed albuterol for her asthma and hydrocodone, tramadol, and Tylenol with codeine for her pain in the past. *Id.* at 144. Plaintiff further reports that she gained about thirty to forty pounds as a result of her knee surgery. *Id.* at 31. Plaintiff received Workers Compensation benefits from when she stopped work in 2010 until November 2012, at which point it was reported that she could return to work. *Id.* at 31–32.

On February 6, 2012, Plaintiff applied for DIB. *Id.* at 10. Plaintiff's application was initially denied on March 28, 2012. *Id.* at 10, 39. As a result of the denial, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on April 6, 2012. *Id.* at 10, 60–61. Plaintiff received a hearing on her application in front of ALJ Robert C. Dorf ("the ALJ") on February 14, 2013. *Id.* at 10, 22–38. Plaintiff was represented by counsel. *Id.* at 5–6, 10, 24, 46–47. She received an Unfavorable Notice of Decision on March 13, 2013. *Id.* at 7, 18. Plaintiff appealed that decision on March 21, 2013. *Id.* at 5. The Appeals Council denied her request for review on May 30, 2014. *Id.* at 1.

On June 10, 2014, Plaintiff filed a complaint against the Commissioner pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Commissioner denying her application for DIB. Dkt. 1 ("Compl."). The Commissioner filed a motion for judgment on the pleadings on January 14, 2015. Dkt. 9 ("C's Memo"). Plaintiff cross-moved for judgment on the pleadings that same day. Dkt. 11 ("P's Memo").

The Commissioner argues the Court should affirm the ALJ's determination that Plaintiff was not disabled because the ALJ properly evaluated the evidence and ap-plied the correct legal standards to the facts. C's Memo at 15–25; *see also* Dkt. 12 ("C's Reply"). Plaintiff, on the other hand, argues that the Court should reverse the ALJ's decision, or at least remand it for further adjudication at the agency level, because (1) the ALJ violated the treating physician rule and (2) the ALJ incorrectly determined that Plaintiff's residual functional capacity ("RFC") would permit her to return to her former job because Plaintiff's past work was light, not sedentary. P's Memo at 7–9. The Court will address each issue raised by Plaintiff in turn.

## DISCUSSION

### I. Legal Standards

#### A. Standard of Review

When a claimant challenges the Social Security Administration's ("SSA") denial of disability benefits, the Court's function is not to evaluate *de novo* whether the claimant is disabled, but rather to determine only "whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir.2004), *amended on reh'g,* 416 F.3d 101 (2d Cir.2005) (internal citation omitted); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."); *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009). Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotation marks omitted) (quoting *Consol. Edison Co. of N.Y., Inc. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Moran,* 569 F.3d at 112. The substantial

evidence test applies not only to the Commissioner's factual findings, but also to inferences and conclusions of law to be drawn from those facts. *See Carballo ex rel. Cortes v. Apfel,* 34 F.Supp.2d 208, 214 (S.D.N.Y.1999) (Sweet, J.). In determining whether the record contains substantial evidence to support a denial of benefits, the reviewing court must examine the entire record, weighing the evidence on both sides to ensure that the claim "has been fairly evaluated." *See Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999) (internal quotation marks omitted) (citing *Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983)).

 It is the function of the SSA, not of the federal district court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1983) (citing *Richardson,* 402 U.S. at 399, 91 S.Ct. 1420); *see also Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998). Although the ALJ need not resolve every conflict in the record, "the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Calzada v. Asture,* 753 F.Supp.2d 250, 268–269 (S.D.N.Y.2010) (Sullivan, J.) (internal quotation marks omitted) (citing *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984)).

 To fulfill this burden, the ALJ must "adequately explain his reasoning in making the findings on which his ultimate decision rests" and must "address all pertinent evidence." *Kane v. Astrue,* 942 F.Supp.2d 301, 305 (E.D.N.Y.2013) (Kuntz, J.) (quoting *Calzada,* 753 F.Supp.2d at 269). "[A]n ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." *Id.* (internal quotation marks and citations omitted). Re-

mand is warranted when "there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan,* 168 F.3d 72, 83 (2d Cir.1999).

## B. Statutory and Regulatory Standards

To qualify for DIB, the Social Security Act requires the claimant to prove she has a disability. *See* 42 U.S.C. § 423(a)(1)(E). "Disability" is defined in the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

 The Commissioner must evaluate whether an individual qualifies as disabled using a five step process promulgated by the Social Security Administration ("SSA"):

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider h[er] disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional

capacity to perform h[er] past work. Finally, if the claimant is unable to perform h[er] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Salmini v. Comm'r of Soc. Sec.*, 371 Fed. Appx. 109, 111–12 (2d Cir.2010) (brackets and ellipses in original) (citations omitted); *see also* 20 C.F.R. § 404.1520. The claimant bears the burden of proof at steps one through four in the analysis. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir.2013) (per curiam) (citations omitted). At step five, the burden shifts to the Commissioner to prove that there are jobs in the national economy that the claimant could perform even with her disability or disabilities. *Salmini*, 371 Fed.Appx. at 112 (citation omitted); *see also Selian*, 708 F.3d at 418.

## II. The ALJ's Decision

On March 13, 2013, the ALJ denied Plaintiff's application for DIB. R. at 18. The ALJ followed the five-step SSA process. *Id.* at 10–18. At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity since June 10, 2010, the alleged onset date of Plaintiff's disability. *Id.* at 12.

At step two, the ALJ found Plaintiff has two severe impairments: "degenerative disc disease of the lumbar spine [and] right knee impairment status post arthroscopy[.]" *Id.* (citation omitted). The ALJ noted that Plaintiff has also been diagnosed with asthma, but found it was not a severe impairment because Plaintiff "continued to work for many years after having been diagnosed with breathing difficulties[.]" *Id.* The ALJ also discussed Plaintiff's obesity, but found that Plaintiff's weight has been stable following her knee surgery and that Plaintiff was able to work prior to the knee surgery when she weighed about the same. *Id.* at 12–13.

The ALJ therefore concluded that Plaintiff's obesity was also not a severe impairment. *Id.* at 13.

At step three, the ALJ determined that none of Plaintiff's severe impairments, neither individually nor together, "me[t] or medically equal[ed] the severity of one of the listed impairments[.]" *Id.*

At step four, the ALJ determined that Plaintiff had the RFC "to perform the full range of sedentary work as defined in [the Code of Federal Regulations]." *Id.* The ALJ began his analysis by discussing Plaintiff's reporting of her condition, but the ALJ found that Plaintiff's testimony regarding "the intensity, persistence, and limited effects of [her] symptoms are not entirely credible[.]" *Id.* at 14. For example, the ALJ discussed Plaintiff's MRI and X–Ray, which showed "degenerative conditions," but which did not "show a significant abnormality consistent with the extent of [Plaintiff's] allegations[.]" *Id.* The ALJ also noted that Plaintiff's treatment history for her back pain was inconsistent with her claims "as one would expect greater conservative measures and surgical consultation" if Plaintiff's condition was as severe as she alleged. *Id.* Further, Dr. Mehrdad Hedayatnia, "a pain management physician," indicated that Plaintiff's pain was relieved though epidural injections. *Id.* at 15. Similarly, the ALJ evaluated the evidence regarding Plaintiff's knee injury and found that the evidence indicated Plaintiff suffered an acute injury to the right knee in July 2010, but that the injury had been healed through September 2010 surgery and subsequent physical therapy. *Id.* "Thus, the evidence is consistent with an acute injury to the right knew that has since resolved." *Id.* The ALJ ultimately determined Plaintiff's complaints were not credible because Plaintiff neglected to attend physical therapy even though it had helped her in the past, Plaintiff never took

additional treatment steps that would be expected if her pain was as great as she alleged, and Plaintiff's history suggested her back pain started in 2007 but she worked until 2010. *Id.* at 16.

The ALJ also discussed in detail the findings of Dr. Rahel Eyassu, a consultative examiner. *Id.* at 15–16. Specifically, the ALJ noted Dr. Eyassu's findings that Plaintiff "walked with a mildly antalgic gait" and had difficulty walking on her toes, that her lumbar range of motion "was only mildly reduced," that Plaintiff's right knee had range of motion of "0 to 130 degrees with complaints of pain" while all other joints were normal, and that Plaintiff's "[u]pper and lower extremity strength was full" and her hand and finger dexterity was unaffected by her complaints. *Id.* at 15–16. Dr. Eyassu concluded Plaintiff had "moderate limitations for repetitive bending, turning, and twisting and she should avoid repetitive squatting, kneeling, crawling, heavy lifting, and sustained pulling and pushing." *Id.* at 16. Ultimately the ALJ concluded that Dr. Eyassu's report was consistent with a finding that Plaintiff could perform sedentary work.

The ALJ also considered an opinion from Dr. Hedayatnia, in which the pain management specialist opined that Plaintiff "can lift or carry only less than ten pounds, stand or walk only for less than two hours, can sit for less than two hours, and must periodically alternative sitting and standing[ ]." *Id.* Dr. Hedayatnia did not discuss any limitations on pushing, pulling, or any other impairment-related physical limitations. *Id.*

The last physician report the ALJ mentioned was that of Dr. Salvatore J. Sclafani, who "indicated that [Plaintiff] should not lift more than ten pounds [and] can stand or walk only for less than two hours in a day[.]" *Id.* at 17. Dr. Sclafani, however, "assessed no restriction on [Plaintiff's] ability to sit, other than to state that [Plaintiff] should be able to change positions as necessary." *Id.*

The ALJ decided to give some weight to Dr. Sclafani's report because the physician treated Plaintiff for several years and the findings were consistent with a February 2012 notation that Plaintiff could perform sedentary work. *Id.* The ALJ, however, gave only limited weight to Dr. Hedayatnia's report because the physician provided no documentation of Plaintiff's restrictions. *Id.* Instead, the ALJ gave greater weight to Dr. Eyassu's opinion because his report was based on documentation of Plaintiff's range of motion and other objective findings. *Id.* Further, the ALJ found Dr. Eyassu's opinion was consistent with the less restrictive findings of the MRI and X–Ray. *Id.*

The ALJ therefore determined that Plaintiff had an RFC of sedentary work. *Id.* The ALJ also determined that Plaintiff's past relevant work was as a Receptionist, which is defined by the Dictionary of Occupational Titles (the "Dictionary")[1] as a sedentary position. *Id.* The ALJ thus held that Plaintiff was capable of performing her past relevant work and so had not been under a disability from June 10, 2010 until the date of the decision. *Id.* at 17–18.

### III. Analysis

Plaintiff argues that the ALJ erred in denying Plaintiff's application for DIB be-

---

1. The Dictionary is "an official publication of the Department of Labor." *Jasinski v. Barnhart,* 341 F.3d 182, 185 (2d Cir.2003). It is what the SSA uses "to evaluate jobs as they are generally performed" in the national economy. *See Paulino v. Colvin,* 13–CV–3718, 2014 WL 2120544, at *19 (S.D.N.Y. May 13, 2014) (Peck, Mag. J.) (internal quotation marks and citation omitted).

cause (1) the ALJ violated the treating physician rule and (2) the ALJ incorrectly determined that Plaintiff's residual functional capacity ("RFC") would permit her to return to her former job because Plaintiff's· past work was light, not sedentary. P's Memo at 7–9. The Court will address each issue in turn.

## A. Treating Physician Rule

■■■ Plaintiff first challenges the denial of DIB on the basis that the ALJ violated the treating physician rule by failing to give controlling weight to the conclusions of her treating physicians, Dr. Sclafani and Dr. Hadayatnia. P's Memo at 8.

■■■ "The SSA recognizes a treating physician rule of deference to the views of the physician who had engaged in the primary treatment of the claimant." *Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir.2003). "The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir.2008); *Green–Younger*, 335 F.3d at 106–07); *see also* 20 C.F.R. § 404.1527(c)(2) (The opinions of a treating source will only be given controlling weight by the reviewing ALJ if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."); *Burgess*, 537 F.3d at 128 (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004)) ("[T]he opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with ... the opinions of other medical experts.") (ellipses in original).

■■■ "In order to override the opinion of the treating physician, [the Second Circuit has] held that the ALJ must explicitly consider, *inter alia:* (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129); *see also* 20 C.F.R. § 404.1527(c)(2) (setting out the factors for the ALJ to consider in determining how much weight a treating physician's opinion should receive: the "length of treatment relationship and the frequency of examination," "[n]ature and extent of the treatment relationship," "[s]upportability," "[c]onsistency ... with the record as a whole," "[s]pecialization," and "any factors [the claimant] or others bring to [the ALJ's] attention, or of which [the ALJ is] aware, which tend to support or contradict the opinion"). Failure on the part of the ALJ to provide "good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Burgess*, 537 F.3d at 129–30 (quotation marks omitted) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999)); *see also Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Plaintiff alleges that both Dr. Sclafani and Dr. Hadayatnia are her treating physicians. P's Memo at 8. The Commissioner does not explicitly argue that Dr. Sclafani and Dr. Hadayatnia are not Plaintiff's treating physicians, but neither does the Commissioner concede the point. C's Reply at 2–6. The Court, however, need not

determine whether Dr. Sclafani and Dr. Hadayatnia are Plaintiff's treating physicians because the ALJ's analysis provides sufficient good reasons to give less than controlling weight to each of their opinions. R. at 16–17.

In assessing Dr. Sclafani's opinion, the ALJ determined that the opinion should be given "some weight." *Id.* at 17. In making this determination, the ALJ first noted that Dr. Sclafani is an orthopedist. *Id.* The ALJ then compared Dr. Sclafani's findings with those of Dr. Eyassu and determined that both reached the conclusion that Plaintiff can perform sedentary work. *Id.* Further, the ALJ noted in making his assessment that Dr. Sclafani treated the Plaintiff for several years and that Dr. Sclafani's sedentary work opinion was consistent with his treatment notes, although not all of his opinions were similarly consistent. *Id.* at 15, 17. In doing so, the ALJ discussed all of the Second Circuit's "good reason" factors, namely whether the physician is an specialist, the consistency of the physician's findings with the other medical evidence, the length of time the physician has known the Plaintiff, and the consistency of the physician's opinion with his own findings. *See Selian,* 708 F.3d at 418 (citation omitted). The Court therefore finds that the ALJ did not err in giving only "some weight" to Dr. Sclafani's opinion.

▆▆▆ In assessing Dr. Hadayatnia's opinion, the ALJ determined that the opinion should only be given "limited weight." *Id.* at 16–17. The ALJ noted that Dr. Hadayatnia was Plaintiff's pain management physician, a specialist, and refer-enced that Dr. Hadayatnia had met with Plaintiff multiple times over the course of Plaintiff's treatment. *Id.* at 14–15, 16–17. The ALJ also discussed Dr. Hadayatnia's opinion and the ways in which it was not supported by objective findings. *Id.* at 16–17 ("Dr. Hadayatnia's opinion is given only limited weight as [Plaintiff] did not report, nor did the doctor document any such significant restrictions over the course of [Plaintiff's] treatment."). The ALJ contrasted this with Dr. Eyassu's specific objective findings, such as those regarding Plaintiff's range of motion. *Id.* at 17. Therefore, as with Dr. Sclafani, the ALJ mentioned all four of the "good reasons" factors laid out by the Second Circuit for making his determination that Dr. Hadayatnia's opinion was not entitled to controlling weight. *See Selian,* 708 F.3d at 418 (citation omitted). The Court therefore finds that the ALJ did not err in giving only "limited weight" to Dr. Hadayatnia's opinion.

Further, the ALJ properly evaluated Dr. Hadayatnia's and Dr. Sclafani's reports in light of all of the evidence before him. The ultimate conclusions of the reports, although not all of their objective findings, were "not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran,* 362 F.3d at 32 (internal citations omitted); *see also* 20 C.F.R. § 404.1527(c)(2). It was therefore appropriate for the ALJ to give these reports more limited weight in assessing the Plaintiff's RFC. R. at 16–17. For ease of explanation, the chart below provides a summary:

| Dr. Hadayatnia | 12/08/11 Report—Plaintiff "received a lumbar epidural steroid injection and paravertebral muscle injection under fluoroscopy" to treat "severe lower back pain with radiation to bilateral lower extremity." R. at 270. Also reported Plaintiff had a "good response to the previous epidural steroid injection." *Id.* Reported normal motor function. *Id.* Noted antalgic gait. *Id.* Plaintiff reported moderate pain in lumbrosacral flexion, mild pain in extension and rotation. *Id.* |
|---|---|

12/22/11 Report—Plaintiff complained of "severe lower back pain with radiation to bilateral lower extremity." *Id.* at 272. Noted decreased range of motion of the lumbar spine and ordered lumbar epidural spinal injections. *Id.* Reported normal motor function again. Id. Again noted antalgic gait. *Id.* Plaintiff again reported moderate pain in lumbrosacral flexion, mild pain in extension and rotation. *Id.*

2/28/12 Report—Reported giving Plaintiff a third injection because of "good response to the previous injection." *Id.* at 274. Reported normal motor function again. *Id.* Again noted antalgic gait. Id. Plaintiff again reported moderate pain in lumbrosacral flexion, mild pain in extension and rotation. *Id.*

11/28/12 Report—Provided patient with lumbar epidural steroid injection. *Id.* at 321. Reported normal motor function again. *Id.* Noted antalgic gait. *Id.* Plaintiff again reported moderate pain in lumbrosacral flexion, mild pain in extension and rotation. *Id.*

12/20/12 Report—"Positive SLR in the bilateral lower extremity has resolved with some of the steroid injection[s] . . . the lower back pain is severely in pain [sic] . . . providing the patient with lumbar facet steroid injection." *Id.* at 319. Reported normal motor function again. *Id.* Noted antalgic gait. *Id.* Plaintiff again reported moderate pain in lumbrosacral flexion, mild pain in extension and rotation. *Id.*

February 12, 2013—Checked boxes indicating Plaintiff could occasionally and frequently lift less than ten pounds, could stand and/or walk for less than two hours, can sit for less than six hours, and "must periodically alternate sitting and standing to relieve pain or discomfort." Id. at 336–37. Indicated she could not assess Plaintiff's ability to push or pull. Id. at 337.

| | |
|---|---|
| Dr. Sclafani | April 4, 2011—Observed good motion, mild quad atrophy, spasm of paraspinal muscles lumbar area, negative straight leg raise, no erythema, no medical and lateral instability. *Id.* at 296. Believed this to be related to "right knee arthoscopy with mild quad atrophy with the right sciatica and spinal stenosis." *Id.*<br><br>May 4, 2011—Observed swelling in popliteal area, minimal effusion, no heat, no erythema, no instability, negative straight leg raise, spasm of paraspinal muscles lumbar area, no signs of infection. *Id.* at 295. Believed this to be related to right knee arthoscopy and DJD lumbar spine. *Id.*<br><br>June 8, 2011—Observed negative straight leg raise, spasm of paraspinal muscles lumbar area, sensation is intact, no erythema, heat, or swelling of the knee, no instability, stated Plaintiff has "full range of motion." *Id.* at 294. Believed this to be related to right knee arthoscopy, right side sciatica, and spinal stenosis. *Id.*<br><br>July 13, 2011—Observed mild crepitus on range of motion, good motion with quad atrophy, tenderness in lower back and lumbar area, negative straight leg raise, and sensation is intact. *Id.* at 293. Believed this to be related to right knee arthoscopy and right side sciatica. *Id.*<br><br>August 17, 2011—Observed good motion with crepitus, mild swelling of the popliteal area, no medial and lateral instability, mild quad |

atrophy, spasm of paraspinal muscles lumbar area, tenderness to palpitation, sensation intact, and negative straight leg raise. *Id.* at 292. Believed this to be related to right knee arthoscopy and right side sciatica. *Id.*

September 21, 2011—Observed spasm of paraspinal muscles lumbar area, negative straight leg raise, no erythema, no heat, minimal effusion, and "good motion with crepitus." *Id.* at 291. Believed this to be in part related to right knee arthoscopy, possibly also spinal stenosis and right side sciatica. *Id.*

November 16, 2011—Observed negative straight leg raise, spasm of paraspinal muscles lumbar area, "no erythema, no signs of infection, no heat, no medical or lateral instability"; no joint effusion. *Id.* at 290. Observed "questionable swelling under ultrasound." *Id.* Believed this to be related to right knee arthoscopy. *Id.*

January 18, 2012—Observed spasm of paraspinal muscles lumbar area, "mild effusion with crepitus on range of motion", and mild tenderness. Id. at 289. Believed this to be related to right knee arthoscopy. Id.

February 20, 2012—Observed mild popliteal swelling, good and full motion, sensation is intact. *Id.* at 288. Believed this to be related to right knee arthoscopy. *Id.*
Stated "[Plaintiff] can return to sedentary work." *Id.*

March 19, 2012—Observed spasm of paraspinal muscles lumbar area, questionable positive straight leg raise, and mild swelling. *Id.* at 287. Believed this to be related to right knee arthoscopy. *Id.*

April 30, 2012—Observed a question of positive straight leg raise and mild quad atrophy. *Id.* at 286.

May 22, 2012—Checked boxes indicating Plaintiff could occasionally and frequently lift less than ten pounds, could stand and/or walk for less than two hours, "must periodically alternate sitting and standing to relieve pain or discomfort[,]" and cannot push or pull. *Id.* at 316–17.

June 6, 2012—Observed mild soft tissue swelling, range of 0 to 125 with pain, no masses, no erythema, no instability, sensation is intact, mild quad atrophy, and spasm of paraspinal muscles lumbar area. *Id.* at 285.

August 8, 2012—Observed popliteal swelling, full motion of the knee, "strength[ ] of the quads is improving[,]" and sensation is intact. *Id.* at 331. Believed this to be related to right knee arthoscopy. *Id.*

September 5, 2012—Observed antalgic gait, no erythema, no heat, no signs of infection, crepitus on moderate range of motion, tenderness, mild quad atrophy. *Id.* at 330. Believed this to be related to DJD of the right knee and lower back pain. *Id.*

October 3, 2012—Observed antalgic gait, no erythema, no heat, no signs of infection, mild effusion, moderate crepitus on range of motion with pain, no instability, mild quad atrophy. *Id.* at 329. Believed this to be related to DJD of the right knee and lower back pain. *Id.*

| | |
|---|---|
| | November 7, 2012—Observed antalgic gait, no erythema, no heat, no signs of infection, swelling in the popliteal area, good stability, quad atrophy. *Id.* at 328. Believed this to be related to DJD of the right knee post-arthoscopy and lower back pain. *Id.* |
| | December 5, 2012—Observed slow antalgic gait, no erythema, no heat, no signs of infection, mild effusion, good stability, quad atrophy, range is from 0 to 110 with pain, mild crepitus on motion, sensation is intact. *Id.* at 327. Believed this to be related to arthritic change of right knee, right knee arthoscopy, and lower back pain. *Id.* |
| | January 7, 2013—Observed slight antalgic gait, tenderness, crepitus on range of motion, sensation is intact, good stability, quad atrophy, range is from 0 to 110 with pain. *Id.* at 326. Believed this to be related to arthritic change of right knee, right knee arthoscopy, and lower back pain. *Id.* |
| Dr. Eyassu | Noted Plaintiff reported cooking three times a week, showering and dressing herself. *Id.* at 279. |
| | Reported Plaintiff stood because she was uncomfortable in the hard chair. *Id.* Plaintiff has a "mildly antalgic gait" and had difficulty walking on her toes and heels, but needed no help changing or getting on and off the examination table. *Id.* |
| | Indicated limits with Plaintiff's spine and right leg straight leg raising, as well as pain in the right knee. *Id.* at 280. |
| | Gave Plaintiff a fair prognosis; "[l]imitation is moderate on repetitive bending, turning, twisting[; a]void activities such as repetitive squatting, kneeling, crawling, heavy lifting, moderate on sustained pulling and pushing." *Id.* at 281. |

From the above review of the medical evidence, it is evident that while Dr. Hadayatnia and Dr. Sclafani opined that Plaintiff could not perform any work, their observations did not support their conclusions. Both physicians' observations suggested Plaintiff was less limited in her movements than their box checking suggests. Further, Dr. Sclafani did, in February 2012, state "[Plaintiff] can return to sedentary work." R. at 288. In addition, Dr. Eyassu, whose observations did not vary widely from the reported observations of Dr. Hadayatnia and Dr. Sclafani, submitted an opinion consistent with the ability of Plaintiff to perform sedentary work. "Given the [inconsistency of Dr. Hadayatnia's and Dr. Sclafani's ultimate opinions with their findings], the ALJ was free to discount [their] opinions in favor of a broader view of the medical evidence,

notwithstanding [their alleged] status as [ ] 'treating physician[s].' " *Michels v. Astrue,* 297 Fed.Appx. 74, 76 (2d Cir.2008). Accordingly, Plaintiff's motion for judgment on the pleadings on the basis of a violation of the treating physician rule must be DENIED. The Commissioner's motion on this issue is GRANTED.

**B. RFC Determination**

Plaintiff also challenges the denial of DIB on the basis that the ALJ incorrectly determined that Plaintiff's residual functional capacity ("RFC") would permit her to return to her former job because Plaintiff's past work was light, not sedentary. P's Memo at 7–9.

"[At] the fourth stage of the [SSA] inquiry, the claimant has the burden to show an inability to return to her previ-

ous specific job *and* an inability to perform her past relevant work generally." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir.2003) (citation omitted) (emphasis in original). "[T]he ALJ's finding that Plaintiff could perform [her] past relevant work . . . as generally performed is sufficient to negate a finding of disability at step four[;] it is not necessary for the Court to determine whether Plaintiff could perform her past relevant work as actually performed." *Grogg v. Comm'r of Soc. Sec.*, 11–CV–1381, 2014 WL 1312325, at *13 (N.D.N.Y. Mar. 31, 2014) (Mordue, J.) (citations omitted). "In determining whether [Plaintiff] can perform [her] past relevant work as generally performed, the inquiry is not whether [Plaintiff] is able to perform the duties of her previous job, but whether [Plaintiff] is able to perform the duties associated with her previous type of work." *Fiedler v. Colvin*, 54 F.Supp.3d 205, 216, 2014 WL 4926332, at *10 (E.D.N.Y.2014) (Spatt, J.) (internal quotation marks, brackets, and ellipses omitted) (citing *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir.2004)).

▆▆ "The Dictionary . . . is used to evaluate jobs as they are generally performed." *Paulino v. Colvin*, 13–CV–3718, 2014 WL 2120544, at *19 (S.D.N.Y. May 13, 2014) (Peck, Mag. J.) (internal quotation marks omitted) (citing *Petrie v. Astrue*, 412 Fed.Appx. 401, 409 (2d Cir. 2011)). The Second Circuit has noted "[m]any specific jobs differ from those jobs as they are generally performed, and [an individual] may identify those unique aspects without contradicting the Dictionary." *Jasinski*, 341 F.3d at 185. Deviations from the Dictionary's description of a job as generally performed when describing a specific previous job "do not actually conflict with the Dictionary." *Id.* (internal quotation marks omitted).

Here, the ALJ determined that Plaintiff was capable of performing her past rele-

vant work as a Receptionist. R. at 17. The ALJ found that Plaintiff worked as a Receptionist because she testified that her job involved "sitting and standing, performing duties including filing, office work, billing, and telephone work[,]" as well as running errands. *Id.; see also id.* at 33–35.

According to the Dictionary, the job of Receptionist includes performing a "variety of clerical duties", including telephone duties "and other duties pertinent to type of establishment." 237.367–038 Receptionist, Dictionary of Occupational Titles, 1991 WL 672192 (1991). The Dictionary identifies the work as "Sedentary Work—Exerting up to 10 pounds of force occasionally . . . and/or a negligible amount of force frequently . . . to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." *Id.*

Plaintiff now contests the description of her past work as that of a Receptionist because she argues that her "past work was light, not sedentary." P's Memo at 9. Plaintiff argues this is the case because her past work involved performing clerical duties that involved "lifting/carrying up to 20 pounds, and standing/walking one-half of the workday." *Id.* at 8 (citations omitted). Plaintiff also testified that her past work involved "filing[,]" "administrative things like an office," speaking to customers on the phone and answering phones, and running errands that involved going to the bank, going to the post office, and dropping off packages with "papers and things." R. at 33–35. Plaintiff never suggests what Dictionary definition her past work should fall under; she only asserts

that it cannot fall under the definition of Receptionist. P's Memo at 8–9.

Plaintiff's argument is unavailing. Plaintiff's past job falls under the general definition of Receptionist because most of her work was clerical work, such as filing, office work, telephone work, and "other duties pertinent to the type of establishment[,]" such as running errands. 237.367–038 Receptionist, Dictionary of Occupational Titles, 1991 WL 672192 (1991); *see also* R. at 33–34. That Plaintiff may be unable to perform her specific past work because that job required lifting of packages and more frequent standing does not mean Plaintiff cannot perform the job of Receptionist generally. The ALJ needed only to determine Plaintiff could perform her past work generally to find that she was not disabled. *See, e.g., Fiedler,* 54 F.Supp.3d at 216–17, 2014 WL 4926332 at *10; *Grogg,* 2014 WL 1312325 at *13. The ALJ correctly determined that Plaintiff could perform sedentary work and could perform all of the duties under the Dictionary definition of Receptionist. R. at 17.

The Court therefore GRANTS the Commissioner's motion for judgment on the pleadings and DENIES Plaintiff's cross-motion for judgment on the pleadings in relation to the ALJ's finding that Plaintiff was able to perform her past work as a Receptionist at step four.

## CONCLUSION

For the reasons stated herein, Plaintiff's motion for judgment on the pleadings is DENIED, and Commissioner's motion for judgment on the pleadings is GRANTED. This matter is hereby dismissed. The Clerk of Court is respectfully instructed to close this case.

**SO ORDERED.**